**Grace M. GOODEAGLE, Thomas Charles Bear, Edwina Faye Busby, Phyllis Romick Kerrick, Jean Ann Lambert, Florence Whitecrow Mathews, Ardina Revard Moore, Tamara Anne Romick Parker, and Fran Wood, individually and on behalf of similarly situated Members of the Quapaw Tribe of Oklahoma (O–Gah–Pah), Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 11–582 L.

United States Court of Federal Claims.

June 12, 2012.

Nancie G. Marzulla, Roger J. Marzulla, Marzulla Law, LLC, Washington, D.C., for plaintiffs. Stephen R. Ward, John Williams, Conner & Winters, LLP, Tulsa, OK, of counsel.

Stephen R. Terrell, Jody Schwarz, Trial Attorneys, Ignacia S. Moreno, Assistant Attorney General, Environment & Natural Resources Division, U.S. Department of Justice, Washington, D.C., for defendant. Shani Walker, Joshua Edelstein, Office of the Solicitor, U.S. Department of the Interior, Washington, D.C., Thomas Kearns, Rebecca Saltiel, Office of the Chief Counsel, Financial Management Service, U.S. Department of the Treasury, Washington, D.C., of counsel.

## OPINION AND ORDER

GEORGE W. MILLER, Judge.

On September 9, 2011, plaintiffs, enrolled members of the federally recognized Quapaw Tribe of Oklahoma ("Quapaw Tribe" or "Tribe") and owners of allotments of land managed by defendant, the United States, filed this putative class action alleging that

defendant breached fiduciary duties and trust obligations owed to plaintiffs. *See* Compl. (docket entry 1). Defendant has filed a motion to dismiss plaintiffs' complaint for lack of jurisdiction pursuant to Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC"). Defendant's motion relies upon 28 U.S.C. § 1500 and the relationship between this action and a class action filed in the United States District Court for the District of Columbia, *Cobell v. Salazar*, No. 1:96–cv–01285–TFH (D.D.C. filed June 10, 1996). For the following reasons, the Court **GRANTS** defendant's motion.

## I. Background

### A. *Instant Action*

Plaintiffs are enrolled members of the federally recognized Tribe and are successors-in-interest to an undivided ownership interest in allotments of land ratified by defendant in the late nineteenth century and in allotments of land located within the Tribe's 1833 reservation. Compl. 1, ¶¶ 1–9; *see also id.* ¶¶ 12–17 (describing history of Tribe and its land); *id.* ¶ 18 (describing allotment of land to Tribal members). Defendant has managed the land since it was allotted to members of the Tribe. *Id.* ¶ 18.

In 2004, the Tribe, which is not a party to this action, settled "a suit for an accounting of historic federal management of the funds and assets of the Tribe" with the Department of the Interior, the Bureau of Indian Affairs, and others. *Id.* ¶ 19. The Tribe agreed to dismiss its suit and to waive any right to obtain "an accounting of its trust assets or asset management history of its trust assets for all time periods up to and including" the date of the settlement in exchange for an analysis ("Quapaw Analysis") "of the federal government's management of certain Tribal assets, as well as of the Government's management of the lands and other assets allotted to eight individual members of the Tribe." *Id.* The parties agreed that, "upon completion of the Quapaw Analysis, the Tribe would be deemed to have been furnished with an accounting of the Tribe's trust assets." *Id.* The complaint in this case alleges that the settlement agreement with respect to the Tribe's suit "specifically reserved" the Tribe's claims for money damages and the settlement agreement "did not purport to compromise or waive the claim of any individual Tribal member for money damages." *Id.* ¶ 20.

In June 2010, the Quapaw Analysis was completed and transmitted to the government. According to plaintiffs in this action, "[t]he Quapaw Analysis identified numerous and pervasive breaches of the Government's fiduciary duty of trust as to the assets of the Quapaw Tribe and its members." *Id.* ¶ 23.

Plaintiffs' claims in this court arise from a number of defendant's alleged actions and failures to act. First, plaintiffs allege that defendant "fail[ed] to properly manage amounts due and owing to the Quapaw Tribal members under leases, permits, and agreements." *Id.* at 1. Second, plaintiffs assert that they are bringing suit as a result of "government actions or inactions relating to certain real property, personal property . . . , mineral rights, as well as other sums due and owing to them by operation of law." *Id.* at 1–2. Third, plaintiffs allege that defendant engaged in "serious and sustained mismanagement of the Quapaw Tribal members' Individual Indian Money [ ("IIM") ] accounts, trust accounts, and other monetary assets." *Id.* at 2. Fourth, defendant allegedly "mismanage[d] . . . the natural resources and other assets on Quapaw Tribal members' trust/restricted lands." *Id.* Fifth, plaintiffs allege that defendant "continu[es] [to] breach . . . trust [obligations] by allowing non-Indians to appropriate large quantities of valuable restricted property for no payment to that property's owners for many years." *Id.* Moreover, defendant allegedly breached trust obligations by "recently allowing a mining company to continue taking . . . property for far less than that property's fair value . . . and for recently advising the property's owners to sign a release indemnifying the mining company against any claim of liability for appropriating the Quapaw's members' property." *Id.*

Plaintiffs assert seven causes of action against defendant: (1) failure to collect rents and royalties for mineral rights and to properly manage those assets, (2) failure to pro-

tect Tribal members' mineral interests, (3) failure to collect rents and payments for town lots, (4) mismanagement of agricultural leases and rents, (5) failure to protect natural resources and to protect the environment, (6) failure to protect Tribal members and otherwise act in their best interests, and (7) failure to adequately manage IIM accounts. *See id.* ¶¶ 28–65. Plaintiffs seek, among other things, "[a] money judgment [against defendant] in an amount as yet unascertained, according to proof at trial." [1] *Id.* Prayer for Relief.

### B. Cobell

In 1996, beneficiaries of IIM trust accounts brought a putative class action in the D.C. district court against the Secretary of the Interior, the Secretary of the Treasury, and the Assistant Secretary of the Interior for Indian Affairs regarding the defendants' management of IIM accounts.[2] *See Cobell v. Salazar,* No. 1:96–cv–01285–TFH, slip op. at 1 (D.D.C. July 27, 2011) [hereinafter "*Cobell* Order Granting Final Approval of Settlement"]; Def.'s Mot. to Dismiss ("Def.'s Mot.") Ex. 6 (copy of *Cobell* Order Granting Final Approval of Settlement) (docket entry 5, Nov. 7, 2011).

The plaintiffs sought "declaratory and injunctive relief construing the trust obligations of the defendants to members of the plaintiff class, and declaring that the defendants had breached, and were in continuing breach of, their trust duties to the plaintiff class members, an order compelling [the] defendants to perform those legally mandated obligations, an accounting, and the correction and restatement of their IIM accounts." *Cobell* Order Granting Final Approval of Settlement 1.

In 1997, the district court certified *Cobell* as a class action pursuant to Rule 23(b)(1)(A)

and (b)(2) of the Federal Rules of Civil Procedure ("FRCP"). *See Cobell v. Babbitt,* No. 1:96–cv–1285–RCL, slip op. (D.D.C. Feb. 4, 1997) [hereinafter "1997 *Cobell* Order Certifying Class Action"]; Def.'s Mot. Ex. 1 (copy of 1997 *Cobell* Order Certifying Class Action).

In 1999, the district court "held, among other things, that [the] defendants were in breach of certain of their respective trust duties and ordered [the] defendants to provide [the] plaintiffs with an accounting of their IIM accounts." *Cobell* Order Granting Final Approval of Settlement 2 (citing *Cobell v. Babbitt,* 91 F.Supp.2d 1 (D.D.C.1999)). "The United States Court of Appeals for the District of Columbia Circuit affirmed in part and reversed in part, upholding the [district c]ourt's determination that [the] defendants were in breach of their trust duties and affirm[ing] the government's duty to provide a historical accounting." *Id.* (citing *Cobell v. Norton,* 240 F.3d 1081 (D.C.Cir.2001)).

Thereafter, the district court "retained jurisdiction to ensure that the defendants discharged their trust duties and many more years of litigation ensued, including numerous trials and appeals." *Id.* In July 2009, the D.C. Circuit reversed the district court's award of $455.6 million in restitution to the *Cobell* plaintiffs and remanded the case. *Id.*

In December 2009, the parties in *Cobell* entered into a settlement agreement. *See* Joint Mot. for Prelim. Approval of Settlement Ex. 2, *Cobell v. Salazar,* No. 1:96–cv–01285–TFH (D.D.C. Dec. 21, 2010) [hereinafter "*Cobell* Settlement Agreement"]; Def.'s Mot. Ex. 4 (copy of *Cobell* Settlement Agreement). The parties agreed that, "in consideration of the promises and covenants set forth in th[e] Agreement and upon entry by the Court of a Final Order and Judgment

---

1. All but one of the plaintiffs in this action had filed a similar action in the Court of Federal Claims on January 5, 2011. *See Goodeagle v. United States,* No. 1:11–cv–00009–GWM (Fed.Cl. filed Jan. 5, 2011). According to plaintiffs' opposition brief, "[t]o eliminate the Government's Section 1500 argument that the *Goodeagle* Plaintiffs had a claim pending in district court because they had not opted out of the *Cobell* class at the time the original complaint was filed," the initial action was voluntarily dismissed and a

second action was filed after plaintiffs had sought to opt out of the *Cobell* class action. Pls.' Opp'n to Def.'s Mot. to Dismiss 18–19 (docket entry 6, Dec. 8, 2011).

2. "The IIM accounts hold money that originates from various sources, but a majority of the funds are derived from income earned off of individual land allotments." *Cobell v. Babbitt,* 30 F.Supp.2d 24, 28 (D.D.C.1998).

and resolution of any appeals from that Final Order and Judgment, this Action shall be settled and compromised in accordance with the terms of th[e] Agreement." *Cobell* Settlement Agreement 1. The parties further agreed "that the Settlement [was] contingent on the enactment of legislation to authorize or confirm specific aspects of the Settlement" and that the settlement agreement would be null and void if the legislation was not enacted before the agreed-upon date or enacted with material changes. *Id.* at 2; *see also id.* at 15. The agreement attached proposed legislation. *See id.* Ex. A.

The settlement agreement provided that an amended complaint, attached to the agreement, *see id.* Ex. B, would be filed following the enactment of the legislation "solely" as part of the settlement agreement and for the "sole purpose" of settling the litigation. *Id.* at 6; *see also id.* at 15. The amended complaint included (1) "a claim for breach of trust with respect to individual Indians and related request for an historical accounting of the IIM Account"; (2) "a claim for breach of trust seeking equitable restitution to restate the IIM Accounts in accordance with the historical accounting requested"; and (3) "one or more claims for breach of trust with respect to [the] Defendants' mismanagement of trust funds and trust assets requesting damages, restitution and other monetary relief." *Id.* at 16. The amended complaint described two classes. *Id.* The Trust Administration Class consisted of individual Native Americans who had an IIM account in the "Electronic Ledger Era" (which dates from approximately 1985 to the present) *or* had, as of September 30, 2009, "a recorded or other demonstrable ownership interest in land held in trust or restricted status." *Id.* at 14. The Historical Accounting Class consisted of individual Native Americans who had an IIM account that was open and had at least one credit to it between October 25, 1994 and September 30, 2009. *Id.* at 10.

The amended complaint alleged "Funds Administration Claims," "Land Administra-

tion Claims," and "Historical Accounting Claims." *See id.* at 16. The Funds Administration Claims, as defined in the settlement agreement, alleged "breach of trust and mismanagement of individual Indian trust funds" and was based on conduct specified in the settlement agreement, such as, for example, failure to collect or credit funds owed under a lease, sale, easement, or other transaction. *Id.* at 8. The Land Administration Claims, also defined in the settlement agreement, "alleged breach of trust and fiduciary mismanagement of land, oil, natural gas, mineral, timber, grazing, water and other resources and rights ... situated on, in or under Land" and was based on conduct specified in the settlement agreement, such as, for example, "[f]ailure to lease Land, approve leases or otherwise productively use Lands or assets." *Id.* at 11. The Historical Accounting Claims, as defined in the settlement agreement, were "common law or statutory claims, including claims arising under the Trust Reform Act, for a historical accounting ... of any and all IIM Accounts and any asset held in trust or restricted status, including but not limited to Land ... and funds held in any account, and which [were], or ha[d] been, beneficially owned or held by an Indian trust beneficiary who [was] a member of the Historical Accounting Class." *Id.* at 10.

Pursuant to the settlement agreement, in accordance with FRCP 23(b)(2), members would not be allowed to opt out of the Historical Accounting Class, but would be allowed to opt out of the Trust Administration Class. *Id.* at 19. Members of the Historical Accounting Class would each receive $1,000 for the Historical Accounting Claims. *Id.* at 27. Each member of the Trust Administration Class would receive $500 plus a "pro rata share of the funds remaining in the Accounting/Trust Administration Fund"[3] for the Funds and Land Administration Claims. *See id.* at 28–29.

The settlement agreement provided that each member of the Historical Accounting Class was "deemed to have released, waived

---

3. The *Cobell* Settlement Agreement specified how the "funds remaining in the Accounting/Trust Administration Fund" would be determined and

how each member's "pro rata share" would be determined. *Cobell* Settlement Agreement 28–29.

and forever discharged" the defendants "from the obligation to perform a historical accounting of his or her IIM Account or any individual Indian trust asset," including any right to an accounting in aid of the jurisdiction of a court, except as provided elsewhere in the settlement agreement. *Id.* at 43. Each member of the Historical Accounting Class was "forever barred and precluded" from bringing Historical Accounting Claims. *Id.* Each member of the Trust Administration Class who did not properly and timely opt out was "forever barred and precluded" from bringing Funds and Land Administration Claims. *Id.* at 44. However, Trust Administration Class members who properly and timely opted out would preserve and not release, waive, or discharge Funds and Land Administration Claims. *Id.* at 46. Moreover, Trust Administration Class members who properly and timely opted out would retain and be entitled to all methods of proof; any evidentiary presumptions and inferences; and means of discovery available in court, "including without limitation any right to an accounting in aid of the jurisdiction of a court to render judgment." *Id.*

Following the parties' agreement, "Congress held hearings, vetted the terms of the settlement, and caused the parties to agree to certain additional modifications." *Cobell* Order Granting Final Approval of Settlement 3. In December 2010, Congress passed and the president signed the Claims Resolution Act of 2010, Pub.L. No. 111–291, 124 Stat. 3064. The legislation appropriated funding and "authorized, ratified and confirmed" the settlement agreement as modified by the parties. *Id.* § 103(c), 124 Stat. at 3066. Congress provided that the district court would have jurisdiction over the amended complaint notwithstanding the jurisdictional limitations under the Little Tucker Act, 28 U.S.C. § 1346(a)(2), and also provided that the district court could certify the Trust Administration Class notwithstanding certification requirements under FRCP 23 and that such certification would be treated as a certification pursuant to FRCP 23(b)(3). *See* Pub.L. No. 111–291, § 103(d)(1)–(2), 124 Stat. at 3066–67.

Judge Thomas F. Hogan of the district court then "entered an order preliminarily approving the Settlement Agreement on December 21, 2010, providing for, among other things, notice to the plaintiff classes in addition to procedures for objections to the Settlement Agreement and for members of the Trust Administration Class to exclude themselves from that class." *Cobell* Order Granting Final Approval of Settlement 3; *see* Def.'s Mot. Ex. 5 (copy of preliminary approval order). At the same time, the district court permitted plaintiffs to file the amended complaint (authorizing plaintiffs to assert Funds and Land Administration Claims), modified the 1997 certification of the class to make it conform to the Historical Accounting Class in the amended complaint, and certified the Trust Administration Class in the amended complaint. *Cobell* Order Granting Final Approval of Settlement 3; *see also* Def.'s Mot. Ex. 3 (order certifying the Trust Administration Class and modifying the 1997 class certification).

Plaintiffs in this case filed Notices of Exclusion in which they stated they wished to opt out of the Trust Administration Class. Pls.' Opp'n to Def.'s Mot. to Dismiss ("Pls.' Opp'n") Ex. A (docket entry 6, Dec. 8, 2011). Although opting out of the Historical Accounting Class was not permitted by the district court, plaintiffs stated in their Notices of Exclusion that, "due to the unique history of the Quapaw Tribe and [their] mineral resources, [they] also wish[ed] to protest [their] inclusion in the Historical Accounting Class and should the court in its fairness determination allow Quapaw members to exclude themselves from the Historical Accounting Class, [they] provide[d] notice that [they] ha[d] chosen to exclude [themselves] from that class as well." *Id.*

In June 2011, the district court held a fairness hearing relating to the proposed settlement in *Cobell* pursuant to FRCP 23(e)(2). On July 27, 2011, the district court entered an order which, among other things, (1) granted final approval of the settlement pursuant to FRCP 23(e); (2) held that the Historical Accounting Class and the Trust Administration Class satisfied the requirements of FRCP 23(a) and that, in any event, the

Claims Resolution Act suspended FRCP 23 requirements with respect to the Trust Administration Class; (3) held that the requirements of FRCP 23(b)(1)(A) and (b)(2) were satisfied with respect to the Historical Accounting Class and granted "final certification" of the Historical Accounting Class; (4) held that the Trust Administration Class was properly certified pursuant to the Claims Resolution Act and, in the alternative, FRCP 23(b)(3); (5) held that the Trust Administration Class would be treated as a class under FRCP 23(b)(3); and (6) granted "final certification" of the Trust Administration Class. Attached to the July 27, 2011 order were lists of individuals who were excluded from the Trust Administration Class. *See id.* Exs. A–B. The names of plaintiffs in this action appear on those lists. The district court also held that the settlement agreement and the court's judgment were binding on all members of the Historical Accounting Class and that they "shall be deemed to have released, waived and forever discharged" the defendants in accordance with the settlement agreement.

The clerk of the district court entered judgment on August 4, 2011 reflecting Judge Hogan's approval of the settlement. Notices of appeal to the D.C. Circuit from the district court's approval of the settlement were filed by class members Kimberly Craven, No. 11–5205, Ortencia Ford, et al., No. 11–5229, and Carol Eve Good Bear, et al., Nos. 11–5270, 11–5271, and 11–5272.[4]

The appeals raise numerous issues. For example, Kimberly Craven's appeal, No. 11–5205, raises the question whether it is "constitutionally permissible to settle a [FRCP] 23(b)(2) mandatory class seeking injunctive relief by waiving the right to injunctive relief in exchange for a monetary payment, when that monetary payment is unrelated to the value of the injunctive relief for individual

class members, and when the court had previously found a right to the injunctive relief." Appellant's Statement of Issues, *Cobell v. Salazar*, 679 F.3d 909 (D.C.Cir.2012). The consolidated appeals by Carol Eve Good Bear, et al., Nos. 11–5270, 11–5271, and 11–5272, raise issues such as (1) whether the district court erred in certifying the Historical Accounting Class under FRCP 23(b)(2) and in approving the settlement, "thus denying [appellant] the historical accounting sued for and prepared by [the] defendant, and denying [appellant] the opportunity to opt out of this plaintiff class," and (2) whether members of the Historical Accounting Class "who [would] be bound by the rulings ... with no opportunity to opt out and seek the relief already adjudicated in this matter and upheld by th[e D.C. Circuit]" were deprived of due process. Appellants' Statement of Issues, *Cobell v. Salazar*, No. 11–5270, 2012 WL 1884702 (D.C.Cir. May 22, 2012).

Plaintiffs in this action filed their complaint when the appeals in the D.C. Circuit were pending. The D.C. Circuit recently affirmed Judge Hogan's approval of the settlement. *See Cobell v. Salazar*, 679 F.3d 909 (D.C.Cir.2012); *Cobell v. Salazar*, No. 11–5270, 2012 WL 1884702 (D.C.Cir. May 22, 2012).[5]

## II. Discussion

### A. *Motion to Dismiss for Lack of Jurisdiction*

 Plaintiffs bear the burden of establishing this Court's jurisdiction over their claims by a preponderance of the evidence. *See Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed.Cir.1988). In deciding a motion to dismiss for lack of jurisdiction, the Court must accept as true all undisputed facts alleged in plaintiffs' complaint and draw all reasonable inferences in

---

4. The appeal by Ortencia Ford, et al., No. 11–5229, was voluntarily dismissed.

5. As noted by plaintiffs and defendant in their supplemental briefs relating to the effect of the recent affirmance by the D.C. Circuit, the time for filing a petition for rehearing or rehearing en banc with the D.C. Circuit or filing a petition for a writ of certiorari with the Supreme Court has not expired. United States' Supplemental Br. in

Supp. of Its [5] Mot. to Dismiss 1–2 (docket entry 20, June 4, 2012); Pls.' Supplemental Br. Regarding Effect of D.C. Circuit's Recent Approval of *Cobell* Settlement on Issues Now Pending Before this Court 1–2 ("[B]ecause the time for petitioning the Supreme Court for review has not elapsed, the *Cobell* case is still technically pending.") (docket entry 21, June 4, 2012).

favor of plaintiffs. *See Henke v. United States*, 60 F.3d 795, 797 (Fed.Cir.1995). "If a Rule 12(b)(1) motion challenges a complaint's allegations of jurisdiction, the factual allegations in the complaint are not controlling and only uncontroverted factual allegations are accepted as true." *Shoshone Indian Tribe of Wind River Reservation, Wyo. v. United States*, 672 F.3d 1021, 1030 (Fed.Cir.2012). Under those circumstances, the court may consider evidence extrinsic to the pleadings.[6] *Id.*

### B. *28 U.S.C. § 1500*

The Tucker Act grants the Court of Federal Claims jurisdiction over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1).

Section 1500 of Title 28 deprives the Court of Federal Claims of jurisdiction over

> any claim for or in respect to which the plaintiff or his assignee has pending in any other court any suit or process against the United States or any person who, at the time when the cause of action alleged in such suit or process arose, was, in respect thereto, acting or professing to act, directly or indirectly under the authority of the United States.

28 U.S.C. § 1500. "Congress first enacted the jurisdictional bar now codified in § 1500 to curb duplicate lawsuits brought by residents of the Confederacy following the Civil War." *United States v. Tohono O'Odham Nation*, ── U.S. ──, 131 S.Ct. 1723, 1728, 179 L.Ed.2d 723 (2011). "The so-called 'cotton claimants'—named for their suits to recover for cotton taken by the Federal Government—sued the United States in the Court of Claims under the Abandoned Property Collection Act, 12 Stat. 820, while at the same time suing federal officials in other courts, seeking relief under tort law for the same alleged actions." *Id.*

 "The rule is more straightforward than its complex wording suggests. The [court] has no jurisdiction over a claim if the plaintiff has another suit for or in respect to that claim pending against the United States or its agents." *Id.* at 1727. "The rule in § 1500 effects a significant jurisdictional limitation...." *Id.* at 1729. "The text of § 1500 reflects a robust response to the problem first presented by the cotton claimants." *Id.* at 1728. Section 1500 "bars jurisdiction in the [Court of Federal Claims] not only if the plaintiff sues on an identical claim elsewhere—a suit 'for' the same claim—but also if the plaintiff's other action is related although not identical—a suit 'in respect to' the same claim." *Id.* The "in respect to" phrase "suggests a broad prohibition." *Id.*

Courts have identified several purposes sought to be served by the statute. In *Tohono*, the Supreme Court stated that the aim of the statute is to "save the Government from burdens of redundant litigation." *Id.* at 1730. The Supreme Court also stated, "The jurisdictional bar in § 1500 was enacted in part to address the problem that judgments in suits against officers were not preclusive in suits against the United States [at the time]." *Id.* In *Matson Navigation Co. v. United States*, Justice Stone wrote that "the

**6.** Pursuant to Federal Rule of Evidence 201, plaintiffs have moved for judicial notice of three briefs filed by the defendants in *Cobell* (docket entries 12 and 15, Apr. 17 and 25, 2012). The briefs sought to be judicially noticed are the defendants' two appellate briefs in the appeals in the D.C. Circuit—No. 11–5205; and Nos. 11–5270, 11–5271, and 11–5272—and the defendants' Memorandum in Support of Final Approval of Settlement and Response to Objections filed with the D.C. district court. *See* Unopposed Mot. of Pls. for Judicial Notice of Filing of Brs. in *Cobell* Appeals in D.C. Circuit Exs. A–B; Pls.' Unopposed Second Mot. for Judicial Notice Ex. A.

For purposes of deciding defendant's motion to dismiss for lack of jurisdiction, the Court may consider these matters outside the complaint without judicially noticing the briefs filed in *Cobell*. However, as defendant does not oppose the motion and "[i]t is well settled that 'courts routinely take judicial notice of documents filed in other courts,'" *L–3 Commc'ns Integrated Sys., L.P. v. United States*, 79 Fed.Cl. 453, 464 n. 23 (2007) (quoting *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir.1991)), the Court **GRANTS** plaintiffs' motions for judicial notice of three briefs filed by the defendants in *Cobell*.

declared purpose of this section ... was only to require an election between a suit in the Court of Claims and one brought in another court against an agent of the government, in which the judgment would not be res adjudicata in the suit pending in the Court of Claims." 284 U.S. 352, 355–56, 52 S.Ct. 162, 76 L.Ed. 336 (1932). In *UNR Industries, Inc. v. United States*, the Federal Circuit described the original purposes of the statute as "to force an election of forum and to prevent simultaneous dual litigation against the government." 962 F.2d 1013, 1021 (Fed. Cir.1992) (en banc), *aff'd sub nom. Keene Corp. v. United States*, 508 U.S. 200, 113 S.Ct. 2035, 124 L.Ed.2d 118 (1993). More recently, the Federal Circuit explained that "the statute was enacted to prevent a claimant from seeking recovery in district court and the Court of Claims for the same conduct pleaded under different legal theories." *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed.Cir.2011).

1. *Plaintiffs Had Claims "Pending" in the D.C. Circuit for Purposes of § 1500 When They Filed Their Complaint in this Court*

■ The relevant time for determining whether a plaintiff has a claim "pending" in another court for purposes of § 1500 is the time a plaintiff filed a complaint in the Court of Federal Claims. *See Keene Corp.*, 508 U.S. at 209, 113 S.Ct. 2035; *Loveladies Harbor, Inc. v. United States*, 27 F.3d 1545, 1548 (Fed.Cir.1994) (en banc). "[A] suit is pending for purposes of section 1500 until its final adjudication on appeal or until the time for appeal has run." *Jachetta v. United States*, 94 Fed.Cl. 277, 283 (2010); *accord Tallacus*

*v. United States*, 99 Fed.Cl. 235, 237 (2011). *But see Young v. United States*, 60 Fed.Cl. 418, 425 (2004) ("The Court concludes that, once a claim is dismissed or denied, it is no longer pending in another court, for purposes of Section 1500, until a motion for reconsideration or notice of appeal is filed.").

a. Plaintiffs Were Unnamed Members of the Certified Historical Accounting Class in *Cobell*

■ Given the allegations in their complaint, plaintiffs were members of the *Cobell* Historical Accounting Class, defined as individual Native Americans who had an IIM account that was open and had at least one credit to it between October 25, 1994 and September 30, 2009. *See* Compl. ¶¶ 35, 41, 53, 58, 61–65. Plaintiffs were also members of the *Cobell* Trust Administration Class, which consisted of individual Native Americans who had an IIM account in the "Electronic Ledger Era" (which dates from approximately 1985 to the present) or, as of September 30, 2009, had a "recorded or other demonstrable ownership interest in land held in trust or restricted status." *Cobell* Settlement Agreement 14; *see* Compl. ¶¶ 1–9, 18, 29, 58–61.

It is undisputed that plaintiffs opted out of the Trust Administration Class in *Cobell*. At oral argument, plaintiffs conceded that they were not successful in their attempts to opt out of the Historical Accounting Class.[7] Apr. 20, 2012 Hr'g Tr. 43:9–10 (docket entry 17).

■ For the reasons discussed below, the Court concludes that a plaintiff has a claim pending for purposes of § 1500 if a plaintiff

---

7. Plaintiffs had suggested in certain sections of their memorandum in opposition to defendant's motion to dismiss that plaintiffs opted out of the Historical Accounting Class. *See, e.g.,* Pls.' Opp'n 1, 20, 27.

The district court's docket in *Cobell* shows that the Tribe on behalf of members and members themselves made several attempts to opt out of the Historical Accounting Class and objected to the settlement. In addition to the Notices of Exclusion, the Tribe and some members of the Tribe filed (1) "Objections of the Quapaw Tribe of Oklahoma (O–Gah–Pah) Concerning Proposed Settlement and Notice of Intent to Appear at the Fairness Hearing," (2) "The Members of the Quapaw Tribe of Oklahoma's (O–Gah–Pah) Re-

quest to Supplement Their Objections to the Proposed Settlement and Notice of Intent to Appear at Fairness Hearing," (3) "Motion for Leave to File Corrected Objections Concerning Proposed Settlement on Behalf of the Quapaw Tribe of Oklahoma (O–Gah–Pah) and Tribal Members," (4) "Motion of Quapaw Tribal Members to Opt Out of Proposed Settlement Agreement," and (5) "Intervenor–Applicant Quapaw Tribe of Oklahoma's (O–Gah–Pah) Motion to Intervene as a Plaintiff." Judge Hogan rejected the attempts by plaintiffs to opt out of the Historical Accounting Class and their objections to the settlement in opinions and orders dated September 13, 2011, July 27, 2011, June 17, 2011, and June 9, 2011.

files a complaint in this court when the plaintiff is an unnamed member of a *certified* class in a suit in another court. First, the Court relies on *Jaffe v. United States,* 215 Ct.Cl. 906 (1977); *see also S. Corp. v. United States,* 690 F.2d 1368, 1370 (Fed.Cir.1982) (en banc) (adopting decisions of the Court of Claims as precedent). In *Jaffe,* the plaintiffs in the Court of Claims were unnamed members of a class that had not yet been certified. The Court of Claims rejected the defendant's § 1500 argument that the plaintiffs had claims pending in the district court. The court explained that "none of the plaintiffs in the case at bar is a plaintiff in the [other] case and none intends to participate in a class action in the district court case, if it should be certified as a class action." 215 Ct.Cl. at 906. Although the Court of Claims did not apply § 1500 in that particular case, this Court reads *Jaffe* as indicating that § 1500 would apply if the earlier suit were a class action and the plaintiff was an unnamed member of a certified class in that suit.

Second, the Court relies on the plain meaning of the "has pending" language as well as the purposes of § 1500. Interpreting § 1500 as barring a suit by a plaintiff in this court when the plaintiff is an unnamed member of a certified class in an action in another court serves the purposes of the statute "to force an election of forum and to prevent simultaneous dual litigation against the government." [8] *UNR Indus.,* 962 F.2d at 1021.

The Court rejects plaintiffs' argument that § 1500 should not apply when a class member wishes to opt out of the action in the other court but is not permitted to do so. It is not unusual for an unnamed class member in a non-opt out class action to be affected by the action despite the fact that he, as plaintiffs put it, is "captive" or "involuntary[ily]" participating in the action. Pls.' Opp'n 3, 28, 32. For example, res judicata principles generally apply to an action later brought by an unwilling participant in a non-opt out class action. *See generally* 5 *Moore's Federal Practice* § 23.181[2] (2011) ("Mem-

bers of [Rule 23(b)(1) or (b)(2) ] classes generally do not have the choice to opt out, as do members of Rule 23(b)(3) classes, and, therefore, may be bound by the judgment reached in the action even though they did not receive individual notice or an opportunity to opt out." (footnote omitted)). The Supreme Court in *Tohono* touched on the issue of voluntariness in rejecting the argument that its interpretation of "for or in respect to" ought not prevail because it was "unjust." *Tohono,* 131 S.Ct. at 1730–31 ("The Nation could have filed in the CFC alone and if successful obtained monetary relief to compensate for any losses caused by the Government's breach of duty. It also seems likely that Indian tribes in the Nation's position could go to district court first without losing the chance to later file in the CFC...."). However, the Supreme Court added:

> Even were some hardship to be shown, considerations of policy divorced from the statute's text and purpose could not override its meaning. Although Congress has permitted claims against the United States for monetary relief in the CFC, that relief is available by grace and not by right. If indeed the statute leads to incomplete relief, and if plaintiffs like the Nation are dissatisfied, they are free to direct their complaints to Congress.

131 S.Ct. at 1731 (citation omitted).

Here, plaintiffs were unnamed members of the certified Historical Accounting Class in *Cobell.* That class was a non-opt out class. Plaintiffs filed their complaint on September 9, 2011. At that time appeals from Judge Hogan's approval of the settlement in *Cobell* were pending in the D.C. Circuit. The appeals challenged, *inter alia,* the settlement of the Historical Accounting Claims and the certification of the Historical Accounting Class as a non-opt out class. Because plaintiffs were unnamed members of the certified Historical Accounting Class in *Cobell,* plaintiffs had claims pending in the D.C. Circuit in

---

**8.** Plaintiffs argue that dismissal would not serve the purposes of the statute under the circumstances of this particular case because *Cobell* had been settled and the settlement had been ratified by Congress and approved by Judge Hogan when

plaintiffs filed their complaint in this court. Pls.' Opp'n 34. Because the appeals had not been finally adjudicated when plaintiffs filed their complaint, dismissal would serve the purposes of the statute.

the *Cobell* case when they filed their complaint in this court.

b. Neither the *Cobell* Settlement Agreement Nor the Claims Resolution Act Affected the Fact that Plaintiffs Had Historical Accounting Claims Pending When Plaintiffs Filed Their Complaint in this Action

Plaintiffs have argued that the *Cobell* settlement agreement or the Claims Resolution Act somehow requires the conclusion that the Historical Accounting Claims in *Cobell* were not pending when plaintiffs initiated this action. Plaintiffs have articulated the argument in various ways. *See* Pls.' Opp'n 2 ("[W]hen Congress approved the *Cobell* settlement, it discharged the claims in the Historical Accounting Class[,] ... explaining that an accounting was impossible to provide. Instead, Congress substituted a nominal $1,000 payment in lieu of an accounting. So the only claim that the *Goodeagle* Plaintiffs could possibly be said to have in the district court has already been discharged."), 3 ("The *Cobell* settlement 'discharged' the accounting sought in *Cobell* and substituted an arbitrary $1,000 payment to class members instead. Thus, there was no Historical Accounting Claim pending when the *Goodeagle* Plaintiffs filed this lawsuit."), 34 ("But there is no longer any claim for a historical accounting in *Cobell* because the right to receive a one-time monetary payment of $1,000 was substituted for that claim in December 2009, when the Settlement Agreement was entered into by the *Cobell* parties, and was certainly replaced by the time Congress approved the Settlement Agreement and the President signed the Settlement Act on December 8, 2010."), 34 ("As the Government [in *Cobell* ] itself has noted, '[b]y passing the 2010 Act, Congress ... manifested its intent ... to substitute this settlement for the implied historical accounting obligation of the United States to trust beneficiaries class members.' Thus, the equitable historical accounting that was the only claim asserted by the *Cobell* plaintiffs until the case had already been settled was forever 'discharged by ... a payment of $1,000 to every class member' as approved by Congress. There was no more Historical Accounting Claim in *Cobell* at the time the *Goodeagle* complaint was filed be-

cause, after 15 years, the United States and the named plaintiffs agreed that a monetary payment should be substituted for a historical accounting that was essentially impossible to conduct anyways." (alterations in original) (footnote omitted) (quoting Defs.' Mem. in Supp. of Final Approval of Settlement & Resp. to Objections at 5, *Cobell v. Salazar,* No. 1:96–cv–01285–TFH (D.D.C. July 27, 2011))).

The Court is not persuaded by plaintiffs' argument that the Historical Accounting Claims were not pending because of the *Cobell* settlement agreement or the Claims Resolution Act. Claims are pending for purposes of § 1500 until dismissed or a final adjudication is reached. *See Pellegrini v. United States,* 103 Fed.Cl. 47, 52 (2012) ("Once filed, claims are pending until dismissed or a final adjudication is reached. Even if a claim is ultimately dismissed for lack of subject-matter jurisdiction, it was pending from the time it was filed until dismissal."). It appears that plaintiffs are equating the settlement agreement and legislation, on the one hand, with final adjudication of the Historical Accounting Claims on the other hand. However, final adjudication had not occurred when plaintiffs filed this case because the appeals from Judge Hogan's approval of the settlement had not been resolved.

As a result and in accordance with the terms of the settlement agreement, payments had not been made in *Cobell* and the releases of the Historical Accounting Class were not effective when plaintiffs filed their complaint in this court. *Cobell* Settlement Agreement 8, 27, 43.

2. *Plaintiffs' Action and Cobell Are "For or in Respect to" the Same Claim for Purposes of § 1500*

 Determining whether two suits are "for or in respect to" the same claim "requires a comparison between the claims raised in the Court of Federal Claims and in the other lawsuit." *Keene,* 508 U.S. at 210, 113 S.Ct. 2035. Two suits are for or in respect to the same claim when they are "based on substantially the same operative facts." *Id.* at 212, 113 S.Ct. 2035. "That the two actions [are] based on different legal

theories d[oes] not matter." *Id.* "Since the legal theory is not relevant, neither are the elements of proof necessary to present a prima facie case under that theory." *Johns–Manville Corp. v. United States,* 855 F.2d 1556, 1564 (Fed.Cir.1988). "Two suits are for or in respect to the same claim, precluding jurisdiction in the CFC, if they are based on substantially the same operative facts, *regardless of the relief sought in each suit.*" *Tohono,* 131 S.Ct. at 1731 (emphasis added). The Federal Circuit recently explained:

> After *Tohono,* it is clear that we must: (1) not view § 1500 narrowly; (2) focus only on whether two claims share the same operative facts and not on the relief requested; and (3) determine whether two suits share substantially the same operative facts by applying the test developed in *Keene Corp.* It is clear, moreover, that our analysis should consider the principles of res judicata to which the Supreme Court pointed.

*Trusted,* 659 F.3d at 1164.[9]

 Determining whether two suits are based on "substantially the same operative facts" is necessarily a fact-intensive inquiry. *See, e.g., Tohono,* 131 S.Ct. at 1731 (holding that the standard was met when two actions were related to the same assets and were based upon "almost identical breaches of fiduciary duty"); *Trusted,* 659 F.3d at 1167 (focusing on whether claims were based on the same contract and same conduct); *Griffin v. United States,* 590 F.3d 1291, 1294 (Fed.Cir.2009) (describing two claims as based on substantially the same operative facts when the plaintiff's "injury for both claims stem[med] from the same single event"). As the language of the standard suggests, *all* of the operative facts need not be the same, i.e., only substantial overlap is required. *Griffin,* 590 F.3d at 1293.

 Here, a comparison of the Historical Accounting Claims in *Cobell* with the claims of plaintiffs in this action reveals that the Historical Accounting Claims in *Cobell* and all claims in this action are based on the same IIM accounts, funds, land, and natural resources. The claims involve the same trust relationship between plaintiffs and the United States and its agents. Plaintiffs conceded as much at the oral argument. Apr. 20, 2012 Hr'g Tr. 62:10–20.

The claims in both suits involve conduct that allegedly violated numerous fiduciary duties and trust obligations owed to plaintiffs. "While the respective complaints may detail different fiduciary failures, the underlying source and scope of the trust are the same. It is this substantial factual overlap rather than any difference in remedies, breaches, or requested relief that triggers § 1500." *Rosebud Sioux Tribe v. United States,* 102 Fed.Cl. 429, 436 (2011). As other judges of this court have noted, "[a]nalogous to ... res judicata principles, as well as proscriptions against claim splitting, these Indian trust cases simply do not lend themselves to differentiations sufficient to preclude application of § 1500." *Id.; see, e.g., Muscogee (Creek) Nation of Okla. v. United States,* 103 Fed.Cl. 210 (2011); *Cheyenne River Sioux Tribe v. United States,* No. 06–915L, 2011 WL 4792905 (Fed.Cl. Oct. 7, 2011). "The nature of Indian trust cases and the government's trust responsibility owed to Indian[s] ... does not lend itself to a simple delineation or separation of operative facts as they pertain to the government's various duties owed to Indian[s]...." *Ak–Chin Indian Cmty. v. United States,* 80 Fed.Cl. 305, 319 (2008). Thus, the Court is not convinced by plaintiffs' argument that § 1500 does not apply because *Cobell* is based on failures related to records and accounting and this action is based on other failures by the United States and its agents. "Whether in con-

---

**9.** In considering the principles of res judicata, the Federal Circuit relied on the "act or contract test" and "evidence test," which "were two governing tests [at the time the predecessor to § 1500 was enacted]." *Trusted,* 659 F.3d at 1169. The Federal Circuit sought to "test [the] conclusion that [a claim] [was] not barred by § 1500 by reference to these tests simply to confirm that [its] conclusion remains true to the principles encompassed in that statutory provision." *Id.* at 1170 n. 5. The Federal Circuit explained that surviving the res judicata tests "does not compel the conclusion that the suits do not arise from substantially the same operative facts," but that "application of the bar of § 1500 is likely compelled" if a plaintiff's claim would have been barred by res judicata in the nineteenth century. *Id.*

nection with a request for an accounting ... or a determination of compensatory damages, in both cases the court would be presented with accounting and other record evidence together with testimony thereon, in considering issues in connection with the government's management and administration of ... assets and funds." *Rosebud Sioux Tribe,* 102 Fed.Cl. at 437.

In fact, plaintiffs' claims in this case are expressly based on the United States' alleged failure to maintain and produce records and account to plaintiffs:

1. "For Quapaw Tribal members, the lease documents maintained by Defendant show a pattern of failure to accurately account for and manage Quapaw Tribal members' mining proceeds and trust accounts." Compl. ¶ 28.

2. "These reports also show a history of Defendant's underreporting of royalty payments owed to Quapaw Tribal members, mismanagement of trust accounts, and mismanagement of property records and title." *Id.* ¶ 29.

3. "The United States has also failed to maintain lease management documents and records of chat piles, demonstrating a pattern of disregard for accuracy in ownership and compensation of Plaintiffs and the class they represent." *Id.* ¶ 34.

4. "Defendant has mismanaged the town lots by failing to maintain adequate and accurate records for the leased lands and by failing to collect and deposit lease proceeds into the [IIM] accounts...." *Id.* ¶ 41.

5. "Nor has Defendant maintained or made available to Plaintiffs and the members of the class they represent, and in some instances has intentionally and actively concealed, records of Defendant's leasing, rent collection, enforcement and inspection or other aspects associated with the leasing of their agricultural property." *Id.* ¶ 52.

6. "Defendant has ... [w]ithheld information from individual Quapaw trust asset interest holders about their own assets...." *Id.* ¶ 60.

7. "Defendant, the United States, has grossly mismanaged, and continues to mismanage, Plaintiffs' IIM accounts by: Failing to keep adequate records and to install an adequate accounting system, including an adequate accounts receivable system; [and] Failing to account to the trust beneficiaries with respect to their money...." *Id.* ¶ 63.

The Historical Accounting Claims alleged by the Historical Accounting Class in *Cobell* are based on substantially the same operative facts relating to records and accounting alleged by plaintiffs here. In the *Cobell* amended complaint, the plaintiffs alleged that the defendants "have failed to keep adequate records and to install an adequate accounting system, including but not limited to their failure to install an adequate accounts receivable system"; "have destroyed records bearing upon their breaches of trust"; and "have failed to account to the trust beneficiaries with respect to their money." Def.'s Mot. Ex. 2, at 2 (*Cobell* amended complaint); *see also id.* Ex. 2, at 10–11. As defined by the *Cobell* settlement agreement, the Historical Accounting Claims were "common law or statutory claims ... for a historical accounting ... of any and all IIM Accounts and any asset held in trust or restricted status, including but not limited to Land ... and funds held in any account, and which now are, or have been, beneficially owned or held by an Indian trust beneficiary who is a member of the Historical Accounting Class." *Cobell* Settlement Agreement 10.

Based on the foregoing analysis, the Court concludes that the "for or in respect to" requirement is satisfied in this case. Specifically, the Court concludes that plaintiffs' claims in the instant action are "based on substantially the same operative facts" as the Historical Accounting Claims in *Cobell.*

## CONCLUSION

For the reasons set forth above, the Court **GRANTS** defendant's motion to dismiss plaintiffs' complaint for lack of jurisdiction pursuant to RCFC 12(b)(1) based on the relationship between this action and the *Cobell* case in light of 28 U.S.C. § 1500. That

**178**

is, the Court finds that at the time plaintiffs filed this action, they had claims pending against the United States in another court based on substantially the same operative facts. Accordingly, the Clerk is instructed to enter judgment dismissing plaintiffs' claims without prejudice.

**IT IS SO ORDERED.**